Filed 10/12/18 (unmodified opinion attached)

## CERTIFIED FOR PARTIAL PUBLICATION[1]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257829 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084177) |
| v. | |
| KEVIN ADAMS, | **ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |
| Defendant and Appellant. | |
| THE PEOPLE, | B259271 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084177) |
| v. | |

---

[1]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I, II, III, IV(C)(1)-(3), and V are certified for publication.

DAVON DELSHANE MORELAND,

      Defendant and Appellant.

      The opinion filed in this matter on October 4, 2018, is hereby modified as follows:  The case title is modified to include the title of the consolidated appeal in case number B259271 as reflected in the title of this order.  In addition, the footnote on the title page is modified to read, "Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I, II, III, IV(C)(1)-(3), and V are certified for publication" and the bracketed sentence above the heading "**V.  Disposition**" on page 55 is deleted in its entirety.  There is no change in the judgment.

_____

JASKOL, J.[2]      BAKER, Acting P. J.      MOOR, J.

---

[2]    Judge of the Superior Court of the County of Los Angeles assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

2

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257829 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084177) |
| v. | |
| KEVIN ADAMS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed as modified and remanded with directions.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant Devon Delshawn Moreland.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Adams.

---

[*]  Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts II, III, and IV(C)(1)-(3) are certified for publication.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

This case is before us a second time after the Supreme Court granted review and transferred the case back with directions to vacate our original opinion and reconsider our decision in light of *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*), which addressed the issues a trial court must consider in sentencing a juvenile nonhomicide offender consistent with the Eighth Amendment.

In our original opinion, issued March 3, 2016, we affirmed defendants' multiple convictions and held defendant Davon Delshawn Moreland forfeited his Eighth Amendment challenge to his 35-year parole eligibility term and, in any event, the term was not cruel and unusual punishment. We also modified defendants' sentences and directed the trial court on remand to hold a hearing on defendants' ability to pay sex offense fines together with applicable penalties and surcharges.

Having reconsidered our decision in light of *Contreras*, we again affirm the convictions, order modifications, and direct the trial court on remand to hold a hearing on ability to pay. In addition, we remand the matter for resentencing of Mr. Moreland. The trial court is directed to consider, in light of *Contreras*, any mitigating circumstances of Mr. Moreland's crimes and life and the impact of any new legislation and regulations on appropriate sentencing. (*Contreras*, *supra*, 4

2

Cal.5th at p. 383.)  The court is further directed to impose a time by which Mr. Moreland may seek parole, consistent with *Contreras*.[3]  (*Ibid*.)  We express no view on whether the sentence to be imposed on resentencing must differ materially from the current sentence Mr. Moreland is serving.  Rather, we leave the impact of *Contreras* to the trial court in the first instance.

## II.    OVERVIEW

A jury convicted Mr. Moreland and his codefendant Kevin Adams of forcible rape in concert (Pen. Code, § 264.1, subd. (a))[4]; forcible oral copulation in concert (former Pen. Code, § 288a, subd. (d)(1), Stats. 2010, ch. 219, § 8); aggravated kidnapping (§ 209, subd. (b)(1)); assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1), Stats. 2004, ch. 494, § 1); second degree robbery (§ 211); and willful, deliberate, premeditated attempted murder (§§ 187, subd. (a), 664).  With respect to the sex offenses, the jury found true the section 667.61, subdivisions (a), (d) and (e) allegations.  The jury further found true multiple gang, great bodily injury and firearm use

---

[3]    The Supreme Court's transfer order was based on Mr. Moreland's petition for review concerning his Eighth Amendment challenge to his sentence.  With the exception of our discussion of *Contreras, supra,* 4 Cal.5th 349 and its effect on Mr. Moreland's sentence, including his 35-year parole eligibility term, this opinion is substantially the same as our original opinion issued on March 3, 2016, as modified on March 16, 2016.

[4]    All further statutory references are to the Penal Code unless otherwise indicated.

3

enhancement allegations.  (Former §§ 186.22, subd. (b)(1)(C), Stats. 2010, ch. 256, § 1; 12022, subd. (a)(1), Stats. 2004, ch. 494, § 3; 12022.3, subd. (a), Stats. 2008, ch. 599, § 5; 12022.5, subd. (a), Stats. 2004, ch. 494, § 4; 12022.7, subd. (a), Stats. 2002, ch. 126, § 6; 12022.8, Stats. 2008, ch. 599, § 6; and 12022.53, subds. (b), (e), Stats. 2006, ch. 901, § 11.1.)  Mr. Moreland admitted he had sustained a prior serious and violent felony robbery conviction within the meaning of sections 667, subdivision (e)(1) and 1170.12, subdivision (c)(1).

In the published portion of this opinion, we modify defendants' presentence custody credits.  Also, we hold that under section 667.61 as amended in 2006, defendants were not entitled to presentence *conduct* credits.  Finally, in the published portion of the opinion, we hold that the indeterminate aggravated kidnapping sentences must be stayed.  (§ 209, subd. (d).) Resolution of the aggravated kidnapping sentence issue requires discussion of the jury instructions.  In the unpublished portion of the opinion, we issue other orders concerning sex offense fines, penalties and surcharges as well as the abstracts of judgment. Subject to our order remanding the matter for resentencing, we affirm the judgments in all other respects.

4

# III.  THE EVIDENCE

## A.  The Prosecution's Case

### 1.  The crimes

Defendants were cousins and fellow members of a violent street gang.  May 2 was the gang's "birthday" or "gang day."  On May 2, 2011, Diane T. was working as a prostitute.  Diane and Geoffrey Odhiambo were sitting in his car in an alley.  Defendants pulled in behind and blocked Mr. Odhiambo's car.  Defendants were in a four-door white car.  Defendants approached Mr. Odhiambo's car.  Mr. Moreland pointed a black gun at Mr. Odhiambo's head.  Mr. Moreland took Mr. Odhiambo's car keys and money.  Mr. Adams asked Diane for money.  He forcibly searched inside her pants and bra.  Mr. Adams grabbed Diane and dragged her to the white car.  Mr. Adams raped Diane in the backseat.  Mr. Adams then moved to the driver's seat.  Over the course of an hour or more, while Mr. Adams drove, Mr. Moreland repeatedly sexually and physically assaulted Diane in the backseat.  Mr. Moreland was armed with a gun during the assaults.  Mr. Moreland forced Diane several times to orally copulate him.  He repeatedly raped her.  Mr. Moreland attempted to sodomize her.  He repeatedly hit her on the head.  Mr. Moreland threatened her with the gun.  He told Diane repeatedly, "Don't look at me."  The car stopped several times.  Mr. Moreland purchased condoms.  He obtained cash.  Mr. Adams told Diane to do what Mr. Moreland told her to do and she would not be hurt.  Mr. Moreland wanted Diane to help them rob

her clients but she refused.  At Mr. Moreland's instruction, Mr. Adams drove to a cul-de-sac and stopped.

Mr. Moreland ordered Diane out of the car.  He punched her in the face breaking her jaw.  Mr. Moreland told Diane to get on her knees.  He ordered her to orally copulate him.  Diane refused.  Mr. Moreland pointed the gun at Diane's forehead and fired twice.  But the gun malfunctioned.  Diane heard it click.  Diane saw Mr. Moreland "messing with the gun."  He was hitting it against his hand.  Diane got up and started to run.  Mr. Moreland ran toward the car.  She heard him arguing with Mr. Adams.  Mr. Adams said, "Stop, bitch."  Diane stopped behind a truck.  Mr. Adams pointed the gun at her.  She heard a click.  Diane ran to a nearby house and summoned help.  Defendants left the scene.

## 2.  The investigation

After law enforcement officers arrived at the cul-de-sac, Diane described her assailants.  Diane said one suspect was a 25 to 35 year old light skinned male Black, approximately 6 feet tall with a muscular build.  The second suspect was a 25 to 30 year old dark skinned Black male, approximately 6 feet tall with a thin build.  Mr. Moreland testified at trial that in May 2011, he was 6 feet 3 to 4 inches tall and weighed 230 pounds.  Mr. Moreland further testified Mr. Adams was 5 feet 11 inches to 6 feet tall.  Diane also worked with a forensic artist, Sandra Enslow, to create sketches of the perpetrators.  At trial, Diane testified, "[The sketch artist] drew them perfect."  The jury was able to compare the sketches to defendants' booking photographs as well as to how they appeared in the courtroom.

On May 12, 2011, 10 days after Diane was assaulted, Mr. Adams was arrested for possessing a black .22-caliber revolver. The weapon was fully loaded with .22-short cartridges. The caliber designation for the firearm was .22-long. The revolver's cylinder was held in place by a metal screw instead of the usual pin. The metal screw impeded the revolver's firing pin, potentially causing it to malfunction. The gun discharged only once in 6 test firings using .22-short-caliber ammunition. The gun discharged only 3 times in 6 test firings using .22-long caliber bullets. When the weapon failed to discharge, it made a clicking sound. The parties subsequently stipulated, "[O]n June 24, 2011, in case number BA385835, *People v. Kevin Adams*, a felony criminal case was filed alleging that defendant Kevin Adams . . . was carrying a concealed firearm on his person, in violation of Penal Code section 12025[, subdivision] (a)(2), and that on November 20, 2012, defendant Kevin Adams . . . pled no contest to that charge[.]" During the investigation and at trial, both victims identified Mr. Adams's gun as similar to the weapon used against them.

On May 15, 2012, law enforcement officers arranged a "bench operation." Defendants, who were both in custody, were seated together on a bench. They were ostensibly waiting to be interviewed by detectives about another case. Their conversation was recorded. An audiotape of the conversation was played at trial. The conversation was as follows: "Adams: Yeah, at first I thought they was gonna bring up that little rape charge . . . ad[d] charge on that rape . . . That's what I thought they were gonna bring up. [¶] Moreland: Yeah . . . [¶] Adams: But this shit . . . this the last shit on my mind nigga . . . I don't know nothing about this nigga. [¶] Moreland: Damn bro . . . [c]aught the fuck

up . . . [¶] Adams: And . . . [¶] Moreland: I never would have came to jail my nigga. [¶] Adams: And look when they add charge me last time, . . . they did bring that shit up . . . [¶] Moreland: Hmm? [¶] Adams: They did, they brought that shit up . . . my nigga . . . with the nigga. They said the bitch don't want to cooperate with the police so he said . . . we can't do no case . . . put nobody on it . . . because she don't want to talk to police, woo, woo, woo. . . . and I found out nigger that's D Monk . . . that D Monk[']s hoe . . . . Nigga . . . [¶] Moreland: Yeah. [¶] Adams: I'm in the dorm with D Monk's brother . . . and he told me like yeah the little Mexican bitch got raped by two niggas, woo woo. He said, he said that . . . [¶] . . . [¶] Adams: All right, he said that . . . she said that the two niggas that raped her were from [defendants' gang] . . . but we don't know what [sect] they from . . . we don't know who they is . . . woo, woo, woo . . . but she said the bitch aint going to court . . . won't talk to police . . . . All right, so I was cool about that you feel me . . . When I came out here that's what I thought they was gonna bring up . . ." And defendants had another conversation as follows: "Moreland: They add charge you right here? For real? [¶] Adams: [Yes], that's why I'm nervous. Yeah. I ain't gonna put that shit to happen . . . Remember that, that night [of the gang] function? And (INAUDIBLE) left? [¶] Moreland: No, hell no. [¶] Adams: I hope it's not that." [sect of the gang] they from . . . we don't know who they is . . . woo, woo, woo (INAUDIBLE) but she said the bitch ain't going to court (INAUDIBLE) won't talk to police . . . All right, so I was cool about that you feel me . . . When I came out here that's what I thought they was gonna bring up. [¶] Moreland: I go to court tomorrow." Further conversation ensued: "Moreland: They add charge you right

8

here? For real? [¶] Adams: . . . that's why I'm nervous. Yeah. I ain't gonna put that shit to happen . . . Remember that, that night [the May 5 gang] function? And (INAUDIBLE) left? [¶] Moreland: No, hell no. [¶] Adams: I hope it's not that."

Detective Derek White testified concerning the foregoing conversations. According to the detective, Mr. Adams was concerned he was going to be charged with a new case, for rape. Mr. Adams talked about a Hispanic prostitute being raped. And how she was not cooperating with the police. Mr. Adams was nervous about it. He thought the rape case was the reason he had been brought in. Detective White summarized: "They're concerned about being add charged for a rape and talking about a [certain gang] function, which is May 2nd. That caught my attention. And then the other part . . . about a Hispanic girl being raped. It all came together that I believe they were talking about a rape that occurred on May 2nd."

The victim, Diane, was missing for approximately 10 months. In late 2012, however, detectives located her. On December 1, 2012, one year and seven months after the assault, Detective White showed Diane two photographic lineups. Initially, Diane identified Mr. Moreland as the driver. She told the detective, "He was the one that initially raped me . . . ." But later she said she had the two men confused and she identified Mr. Moreland as the person who repeatedly assaulted and tried to kill her. She remembered Mr. Moreland. She told detectives it was him "a hundred percent." She said, "I know that face." She then identified Mr. Adams as one of two men depicted in the lineup who could "possibly [be] the driver," but she was unsure.

Surveillance video from a bakery near the cul-de-sac was introduced. The videotape showed a white car passing in the

9

direction of the cul-de-sac at the approximate time of the crimes and, several minutes later, returning in the other direction. Mr. Moreland's girlfriend, Terica Fuller, owned a white, four-door Honda Civic that looked similar to the car depicted in the video. At times, Mr. Moreland used Ms. Fuller's Honda. Diane was shown a photograph of Ms. Fuller's Honda. Diane believed it was the car used by her assailants. In addition, Diane had told law enforcement officers the dashboard in her assailants' vehicle lit up. The dashboard of Ms. Fuller's car had an illuminated display.

At the preliminary hearing and again at trial, Mr. Odhiambo identified Mr. Moreland as the man who committed the robbery. At trial, Mr. Odhiambo stated unequivocally that Mr. Moreland was that man. Mr. Odhiambo testified, "I know he's the one who pointed the gun." Mr. Odhiambo was unable, however, to identify the second man. Also, at both the preliminary hearing and at trial, Diane identified Mr. Adams as the driver and Mr. Moreland as the other assailant.

### 3. The deoxyribonucleic acid evidence

Senior criminalist Christopher Lee collected potential biological evidence from the cul-de-sac including what looked like fresh spit, a piece of a condom wrapper and three blood stains. Mr. Lee delivered the items to the laboratory where they would be processed. At trial, Mr. Lee described the spit: "[It was] relatively large. It didn't appear dry . . . . It appeared relatively fresh."

Criminalist Ashley Platt initially screened the collected evidence for the potential presence of deoxyribonucleic acid. She

10

contemporaneously completed standard, preprinted forms and documented the results of her tests. She forwarded evidence containing potential biological material for deoxyribonucleic acid analysis. Ms. Platt did not testify at trial.

Consistent with protocol, criminalist Yukis Partos conducted a technical review of Ms. Platt's work. Ms. Partos reviewed the entire file including case notes and test results. Ms. Partos testified at trial. She explained that the reason for the technical review was, "[T]o ensure that all of us are following the policy and procedures of our laboratory, the testing is done correctly using the correct control samples, the results are reliable, scientifically done, and to make sure that everything that had to be done is conducted correctly and second analyst who is the technical reviewer are agreeing with the testing done by the original analyst." Ms. Partos testified Ms. Platt followed protocol and performed appropriate tests in a proper manner.

Criminalist Kirsten Fraser also testified at trial. Ms. Fraser analyzed the material forwarded by Ms. Platt. Ms. Fraser generated deoxyribonucleic profiles. At the time she generated the profiles, the only reference samples she had were from the victim. The bloodstains all matched the victim. The possible saliva was from a single source, an unknown male. The victim was a major contributor to the deoxyribonucleic acid on the condom wrapper—1 in 16.2 trillion. There was a possible unknown male contributor as well. Ms. Fraser uploaded the saliva and condom wrapper profiles to a national database. She was notified of a match to Mr. Adams. Ms. Fraser subsequently received reference samples from defendants. She generated deoxyribonucleic acid profiles for each of them. Upon comparison, Ms. Fraser found the saliva matched Mr. Adams.

Mr. Moreland was a possible contributor to the deoxyribonucleic acid mixture found on the condom wrapper—1 in 293 billion. As noted above, the victim was the major contributor to that mix.

## B. The Defense Case

Mr. Moreland testified in his own defense. He denied committing the crimes. He testified that although he had joined the gang when he was 13, he was no longer a gang member. Mr. Moreland testified that May 2 was a big day for a certain gang. Mr. Moreland said, "[E]verybody from the gang goes to that one certain party on this one odd day." Further, he said, "It's like a reunion." But Mr. Moreland denied attending the May 2, 2011 gang function. He admitted he had previously been convicted of robbery in case No. BA374588. He had entered a plea in that case on February 15, 2011. Mr. Moreland told the jury he was a 17-year-old senior in high school when the crimes were committed; he was playing football and had college scholarship offers; he had made a commitment to play football at Oregon State University; and he would not have jeopardized his future by committing any crime.

## IV.  DISCUSSION

[Parts IV(A)-(B) are deleted from publication.  See *post* at page 26 where publication is to resume.]

### A.  Mr. Adams's Appeal—The Admission of Deoxyribonucleic Acid Evidence

#### 1.  Introduction

As discussed above, Ms. Platt—who initially tested collected evidence for the potential presence of deoxyribonucleic acid—did not testify at trial.  Ms. Partos—who reviewed Ms. Platt's work—did testify at trial.  Mr. Adams asserts allowing Ms. Partos to testify concerning Ms. Platt's preliminary tests violated the Sixth Amendment confrontation clause.

#### 2.  Forfeiture

Mr. Adams did not raise this issue in the trial court. Defense counsel, Michael Clark, did not object to Ms. Partos's testimony and did not cross-examine her.  On the Monday following Ms. Partos's Friday testimony, Mr. Clark raised a chain of custody objection.  Mr. Clark argued Ms. Partos's testimony could not be offered in place of Ms. Platt's testimony to establish a chain of custody.  Defendant has not raised any chain of custody argument on appeal.  Moreover, because he did not raise the present confrontation clause issue in the trial court, Mr. Adams forfeited his argument.  (*People v. Lucas* (2014) 60 Cal.4th 153, 330, disapproved on another point in *People v. Romero and*

13

*Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Redd* (2010) 48 Cal.4th 691, 730.)

### 3. There was no confrontation clause violation

Even if Mr. Adams's argument was preserved, no Sixth Amendment violation occurred. Ms. Platt identified possible biological evidence and forwarded it to be examined for deoxyribonucleic acid. Ms. Platt contemporaneously recorded her tests and their results. Ms. Platt did not certify or attest to the contents of her report. And the report's primary purpose did not pertain to a criminal prosecution. Therefore, her report lacked the critical components to be considered testimonial. (*People v. Edwards* (2013) 57 Cal.4th 658, 705; *People v. Dungo* (2012) 55 Cal.4th 608, 619; compare *Bullcoming v. New Mexico* (2011) 564 U.S. 644, 652, 654-655 [131 S.Ct. 2705, 2710, 2717]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 307-311.) Ms. Partos testified Ms. Platt followed protocol and performed appropriate tests in a proper manner. The deoxyribonucleic acid evidence connecting Mr. Adams to the present crimes was not introduced through Ms. Partos. It was introduced through Ms. Fraser's in-court testimony. Ms. Fraser was the criminalist who *independently analyzed* the biological material. Each of the three criminologists who considered the biological evidence had the same sole purpose—to perform her task in accordance with mandated procedures. The technicians' reports' primary purpose was not to accuse. Deoxyribonucleic acid profiles are not inherently inculpatory. They can be exculpatory. The criminalists performed the tests in accordance with accepted procedures with no idea whether the results would exonerate or

inculpate any individual. In fact, Ms. Fraser completed her initial report before any suspect was identified. Her report was generated not to obtain evidence against Mr. Adams or any other individual, but to assist law enforcement to catch a dangerous criminal who was still at large. Ms. Fraser had no way of knowing the deoxyribonucleic profiles she produced would turn out to inculpate anyone whose profile was in a law enforcement database. Given all of the foregoing considerations, allowing Ms. Partos to testify as to Ms. Platt's preliminary tests did not violate Mr. Adams's Sixth Amendment confrontation rights. (*Williams v. Illinois* (2012) 567 U.S. 50, 58, 83-84 [132 S.Ct. 2221, 2228, 2243] [plur. opn. of Alito, J.]; *People v. Lopez* (2012) 55 Cal.4th 569, 581-585; *People v. Dungo, supra,* 55 Cal.4th at pp. 619-621; *People v. Barba* (2013) 215 Cal.App.4th 712, 740-743; *People v. Holmes* (2012) 212 Cal.App.4th 431, 436-439.)

4. Any violation was harmless beyond a reasonable doubt

Confrontation clause violations are subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Capistrano* (2014) 59 Cal.4th 830, 873; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) Any error in not requiring Ms. Platt to testify was harmless beyond a reasonable doubt. Ms. Fraser testified based on her own independent test results matching Mr. Adams's deoxyribonucleic acid to the fresh saliva found in the cul-de-sac. Ms. Fraser was subject to cross-examination. (*People v. Banks* (2014) 59 Cal.4th 1113, 1165-1166, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3 [any error harmless where criminalist testified to her own independent conclusions as to

deoxyribonucleic acid]; *People v. Edwards, supra,* 57 Cal.4th at p. 707 [harmless error where pathologist reached independent conclusion as to cause of death].)  The following constituted abundant evidence of guilt:  Ms. Fraser's testimony concerning the deoxyribonucleic acid match—the presence of Mr. Adams's spit in the cul-de-sac; Diane's identification of Mr. Adams; Mr. Adams's possession of the uniquely defective gun used to commit the crimes; and Mr. Adams's recorded incriminating conversation with Mr. Moreland.  (*People v. Capistrano, supra,* 59 Cal.4th at p. 873; *People v. Harris* (2013) 57 Cal.4th 804, 840.)  The inability to cross-examine Ms. Platt did not affect the trial's outcome as to Mr. Adams.

## B.  Mr. Moreland's Appeal

### 1.  Consolidated charges

The trial court consolidated the present charges against Mr. Moreland (counts 2 through 7) with forcible rape charges involving a second alleged victim, Eboni C.  (§ 954.)  The forcible rape of Eboni C. occurred on a different occasion (count 1).  The trial court also ruled, initially, that the Eboni C. evidence was admissible as evidence of Mr. Moreland's propensity to commit sexual assaults under Evidence Code section 1108, subdivision (a).

Eboni C. testified as follows.  She was related to Mr. Moreland by marriage.  Mr. Moreland was the cousin of the niece of Eboni C.  Eboni C. was at the niece's grandmother's house on April 21, 2012, less than a year after Diane was assaulted.  Mr. Moreland also lived in the home.  Eboni C. was sitting on Mr.

16

Moreland's bed when he walked into his bedroom. Mr. Moreland assaulted Eboni C. He choked her, bit her on the neck and raped her. Eboni C. felt pain and bled from her vagina. A sexual assault nurse examined Eboni C. The sexual assault nurse made physical findings consistent with Eboni C.'s account. Forensic evidence was also introduced connecting Mr. Moreland to the alleged rape.

After Eboni C. testified at trial, however, the forcible rape charges in count 1 were dismissed. The trial court instructed the jury to disregard the testimony of Eboni C. and all of the evidence relevant to that charge. The trial court further instructed the jury not to speculate about why the charges were no longer before them. The instruction was as follows: "Count 1 as it relates to Eboni C., that count is no longer before you. You are not going to be called upon to make any decision in regard to that count. You're not to speculate as to why that charge is no longer before you. All of the previous testimony that was introduced during the trial as it related to count 1, that testimony will be stricken. You are not to consider that testimony for any purpose."

We need not consider whether the trial court abused its discretion when it consolidated the two cases or when it ruled the evidence as to each was cross-admissible. (§ 954; Evid. Code, § 1108, subd. (a).) This is because, as discussed above, the trial court dismissed count 1 and directed the jury not to consider the Eboni C. evidence for any purpose. The dispositive question is whether, despite the trial court's instruction to the jury, the Eboni C. evidence rendered Mr. Moreland's trial fundamentally unfair. (*People v. Merriman* (2014) 60 Cal.4th 1, 46; *People v. Thomas* (2012) 53 Cal.4th 771, 800-801.) The burden is on the defendant to demonstrate a due process denial. (*People v. Soper*

17

(2009) 45 Cal.4th 759, 783; *People v. Johnson* (1988) 47 Cal.3d 576, 591.) The judgment will be reversed on this ground only if it is reasonably probable the jury's verdict was tainted by the Eboni C. evidence. (*People v. Merriman, supra,* 60 Cal.4th at p. 49; *People v. Bean* (1988) 46 Cal.3d 919, 940.) Relevant considerations include whether the evidence as to each victim was relatively straightforward and distinct; the evidence as to each charge was independently ample to support the defendant's conviction; the facts as to one victim as compared to the other were likely to unduly inflame the jury; or one case was significantly weaker than the other. (*People v. Thomas, supra,* 53 Cal.4th at pp. 798-799; *People v. Soper, supra,* 45 Cal.4th at p. 784.)

Here, the evidence in each of the two cases was straightforward and distinct. The evidence in each case was independently sufficient to support a conviction without regard to the other. The present case was not significantly weaker than the evidence as to Eboni C. The facts as to Eboni C. as compared to Diane were not likely to unduly inflame the jury. Eboni C. testified she was raped once by Mr. Moreland, who was known to her. The crimes committed against Diane were vicious and protracted and involved an attempt to murder her. Moreover, there was abundant evidence connecting Mr. Moreland to the crimes against Diane. Both Mr. Odhiambo and Diane positively identified Mr. Moreland on repeated occasions. Mr. Odhiambo was certain Mr. Moreland was the robber. Mr. Odhiambo testified, "I know he's the one who pointed the gun." Diane told Detective White she was "a hundred percent" sure Mr. Moreland was the man who assaulted and tried to murder her. She said, "I know that face." Mr. Moreland made incriminatory statements

18

in the recorded conversation with Mr. Adams.  Mr. Adams was arrested in possession of the gun used to perpetrate the crimes.  Mr. Moreland's girlfriend owned the car defendants used.  Further, deoxyribonucleic acid consistent with Mr. Moreland's was found on the condom wrapper in the cul-de-sac.  Additionally, as noted above, the trial court instructed the jury not to consider any of the evidence as to count 1.  Prior to closing arguments, the trial court repeated that instruction.  Furthermore, the trial court instructed the jury on the presumption of innocence, the elements of each crime, the requisite burden of proof, and the need to consider each charge separately.  We presume the jury understood and followed those instructions.  (*People v. Merriman, supra,* 60 Cal.4th at pp. 48-49; *People v. Pearson* (2013) 56 Cal.4th 393, 477.)  Those instructions mitigated any prejudicial spillover risk.  (*People v. Merriman, supra,* 60 Cal.4th at pp. 48-49; *People v. Thomas, supra,* 53 Cal.4th at p. 801; *People v. Soper, supra,* 45 Cal.4th at p. 784.)  Mr. Moreland has not met his burden to show the Eboni C. evidence had a spillover effect that persuaded the jury to convict him of the charged crimes against Diane.

### 2.  Cruel and unusual punishment

#### a.  Background

On August 14, 2014, the trial court sentenced Mr. Moreland to a lengthy term in prison and set a minimum parole eligibility term of 35 years.  The court considered mitigating factors including Mr. Moreland's age at the time of his offenses (17 years); his abandonment by his birth mother; his upbringing

by older adoptive parents in an unstable home environment located in a "gang neighborhood"; his belief that he had no choice but to join a gang; and his learning disability and attention deficit hyperactivity disorder. Citing a report, the court also found Mr. Moreland "presents himself . . . [as] very immature" and was impulsive in his decision-making.

In addition, citing *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the trial court explained that Mr. Moreland was entitled to an opportunity to demonstrate rehabilitation and fitness to reenter society. Based on Mr. Moreland's life expectancy and age at sentencing (20 years), the court reasoned that "[i]f [Mr. Moreland] were eligible for parole at age 55, this would give him a meaningful opportunity by demonstrating his rehabilitation and fitness to reenter society." The court ruled that Mr. Moreland would be eligible for parole "no later than 35 years from today's date."

In our prior opinion, we held Mr. Moreland forfeited his appellate argument that his sentence was cruel and unusual under the Eighth Amendment and, even if the issue was properly before us, we would not conclude the sentence was cruel and unusual.

After we issued our opinion, the Supreme Court, on May 18, 2016, granted Mr. Moreland's petition for review and held the matter pending its decision in *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*). On August 17, 2016, after the opinion in *Franklin* issued, the Supreme Court further deferred disposition of Mr. Moreland's petition pending its decision in *Contreras*, *supra,* 4 Cal.5th 349.

On June 13, 2018, the Supreme Court transferred the matter to this court with directions to vacate and reconsider our decision in light of *Contreras, supra,* 4 Cal.5th 349.  On June 15, 2018, we notified the parties of their right, under California Rules of Court, rule 8.200(b), to submit supplemental opening and responding briefs.

On June 18, 2018, Mr. Moreland submitted his supplemental opening brief arguing that, under *Contreras, supra*, 4 Cal.5th 349, his "sentence of 205-years-to-life is . . . manifestly unconstitutional."  He asked us to remand the matter to the trial court to give him an opportunity to make a record under *Franklin, supra*, 63 Cal.4th 261 for an eventual youth offender parole hearing.

On June 21, 2018, the Attorney General submitted a supplemental responding brief agreeing that the matter should be remanded to the trial court but only for resentencing under *Contreras*, *supra*, 4 Cal.5th 349.  The Attorney General argued the trial court on remand should not conduct a record development hearing under *Franklin*, *supra*, 63 Cal.4th 261, because Mr. Moreland—who was sentenced as a One Strike juvenile sex offender under section 667.61,[5] as well as a Three

[5]  "Approximately six months after the Legislature enacted the 'Three Strikes' law as urgency legislation, it adopted section 667.61, the One Strike law.  (*People v. Rayford* (1994) 9 Cal. 4th 1, 8 [36 Cal.Rptr.2d 317, 884 P.2d 1369]; *People v. Ervin* (1996) 50 Cal.App.4th 259, 264 [57 Cal.Rptr.2d 728].)  This section sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes perpetrated by force, including rape, foreign object penetration, sodomy, and oral copulation.  [Fn. omitted.]  The section applies if the defendant has previously been convicted of one of seven specified offenses, or if the current

21

Strikes offender under sections 1170.12 and 667, subdivisions (b) through (i)—is not eligible for a youth offender parole hearing (§ 3051, subd. (h)).[6]

### b. *Contreras*

Starting from the premise that "'children are constitutionally different from adults for purposes of sentencing,'" the United States Supreme Court "'has derived a number of limitations on juvenile sentencing : (1) no individual may be executed for an offense committed when he or she was a juvenile [citation]; (2) no juvenile who commits a nonhomicide offense may be sentenced to [life without the possibility of parole, or LWOP] [citation]; and (3) no juvenile who commits a homicide offense may be automatically sentenced to LWOP [citation].' [Citation]." (*Contreras*, *supra*, 4 Cal.5th at p. 359, citing *Miller v. Alabama* (2012) 567 U.S. 460, 471; *Roper v. Simmons* (2005) 543 U.S. 551, 578; *Graham*, *supra*, 560 U.S. at p. 74.)

In *Caballero*, *supra*, 55 Cal.4th 262, a juvenile defendant was sentenced to 110 years to life for three counts of attempted murder and would not become eligible for parole for over 100 years. Our Supreme Court held the sentence was the functional equivalent of LWOP and, under *Graham*, violated the Eighth

---

offense was committed under one or more specified circumstances." (*People v. Manecebo* (2002) 27 Cal.4th 735, 742.)

[6]     Section 3051, subdivision (h) provides, in pertinent part, "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61 . . . ."

Amendment. (*Id*. at p. 268.) The court explained "the state may not deprive [youths] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Ibid*.) Instead, "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Id*. at pp. 268-269.)

Subsequently in *Contreras*, *supra*, 4 Cal.5th 349, the Supreme Court held that sentences of 50 and 58 years to life imposed on juveniles convicted of kidnapping and sexual offenses, with parole eligibility at ages 66 and 74, violated the same Eighth Amendment principles that barred the imposition of LWOP for their crimes. (*Id*. at pp. 360, 367-370; see *id*. at p. 369 [sentence of 50 years to life is functionally equivalent to LWOP].)

The court rejected the argument that a term of imprisonment is not the functional equivalent of LWOP if it provides a juvenile offender an opportunity for parole within his or her expected natural lifetime. (*Contreras*, *supra*, 4 Cal.5th at p. 360.) The court explained this "actuarial approach gives rise to a tangle of legal and empirical difficulties" including the influence of gender, race and other factors on life expectancy, creating a risk of disparate sentencing. (*Id*. at pp. 361-363.) Moreover, life expectancy is an average. (*Id*. at pp. 363-364.) "An opportunity to obtain release does not seem 'meaningful' or 'realistic' within the meaning of *Graham* if the chance of living

long enough to make use of that opportunity is roughly the same as a coin toss." (*Id.* at p. 364.)

Instead of the "misguided" actuarial approach to functional equivalence, courts should ask if "a term-of-years sentence may function like LWOP with respect to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders . . . ." (*Contreras*, *supra*, 4 Cal.5th at p. 364, emphasis omitted.) "To resolve this question, the proper starting point is not a life expectancy table but the reasoning of the high court in *Graham*." (*Ibid.*) While *Graham* does not require the state to release juvenile nonhomicide offenders during their natural lives, it "'prohibit[s] States from making the judgment at the outset that those offenders never will be fit to reenter society.'" (*Id.* at p. 367, quoting *Graham*, *supra*, 560 U.S. at p. 75.) "'What the State must do . . . is give [juvenile nonhomicide offenders] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Ibid.*, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

*Contreras* observed "the high court [in *Graham*] did not define the maximum length of incarceration before parole eligibility that would be permissible in light of the concerns it set forth . . . ." (*Contreras*, *supra*, 4 Cal.5th at p. 367.) "But the high court made clear the nature of its concerns: A lawful sentence must recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability.'" (*Ibid.*, quoting *Graham*, *supra*, 560 U.S. at p. 74.) "A lawful sentence must offer 'hope of restoration' [citation], 'a chance to demonstrate maturity and reform' [citation], a 'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society' [citation]. A lawful sentence must offer 'the opportunity to achieve maturity of

24

judgment and self-recognition of human worth and potential.' [Citation.] A lawful sentence must offer the juvenile offender an 'incentive to become a responsible individual.' [Citation.]" (*Ibid.*) "Ultimately, [the trial court must make] a considered judgment as to whether the parole eligibility date of a lengthy sentence offers a juvenile offender a realistic hope of release and a genuine opportunity to reintegrate into society." (*Id.* at p. 373.)

In the case before it, the court in *Contreras* opined that the defendants' "[c]onfinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." (*Contreras*, *supra*, 4 Cal.5th at p. 368.) The court therefore remanded the matter for resentencing in light of its opinion. (*Id.* at p. 379.)

> c. Remand for resentencing and determination of parole eligibility term

Here, the trial court was well aware of the sentencing considerations discussed in *Graham, supra*, 560 U.S. 48 and *Caballero, supra*, 55 Cal.4th 262 and addressed those factors at the sentencing hearing. The court also considered Mr. Moreland's life expectancy in determining his sentence, although the record does not disclose the extent to which the sentence was based on the court's life expectancy analysis. As noted above, *Contreras* subsequently disapproved an actuarial approach to sentencing. (*Contreras, supra*, 4 Cal.5th at pp. 360-364, 372-373.)

Because the trial court did not have the benefit of the Supreme Court's decision in *Contreras, supra*, 4 Cal.5th 349 when it sentenced Mr. Moreland, we vacate Mr. Moreland's

sentence and remand to the trial court for resentencing. On remand, the trial court is directed to consider, in light of *Contreras*, any mitigating circumstances of Mr. Moreland's crimes and life and the impact of any new legislation and regulations on appropriate sentencing. The trial court is further directed to impose a time by which Mr. Moreland may seek parole, consistent with *Contreras*. (*Id.* at p. 383.)

We deny Mr. Moreland's request that we direct the trial court on remand to hold a hearing under *Franklin, supra*, 63 Cal.4th 261 to allow Mr. Moreland to make a record for an eventual youth offender parole hearing. It is undisputed that, as the law currently stands, Mr. Moreland is not eligible for a youth offender parole hearing under section 3051. As a result, *Franklin* does not authorize a remand for record development. If, in the future, the Legislature modifies the law in a way that makes Mr. Moreland eligible for a youth offender parole hearing (see *Contreras*, *supra*, 4 Cal.5th at p. 382), Mr. Moreland may file an appropriate motion in the trial court.

[Part IV (C)(1)-(3) is to be published.]

C. Other Sentencing Issues

1. Presentence custody credit

The trial court awarded Mr. Adams 562 days of presentence custody credit. However, the parties agree that Mr. Adams was in custody for conduct attributable to the present case from January 2, 2013, to July 18, 2014, a period of 563 days. A defendant is entitled to credit for all days in presentence

26

custody including the day of arrest and the day of sentencing. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.)  Mr. Adams's judgment must be modified and his abstract of judgment corrected to reflect 563 days of presentence custody credit.

The trial court awarded Mr. Moreland 603 days of presentence custody credit.  However, according to the record before us, Mr. Moreland was arrested on December 12, 2012.  He was sentenced on August 14, 2014.  Therefore he was in presentence custody for 611 days.  (*People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 48; *People v. Morgain, supra,* 177 Cal.App.4th at p. 469.)  Mr. Moreland's judgment must be modified and his abstract of judgment corrected to reflect 611 days of presentence custody credit.

## 2.  Presentence conduct credit

Because they were convicted of violent felonies as defined in section 667.5, subdivision (c), the trial court limited defendants' presentence conduct credit to 15 percent under section 2933.1, subdivision (c).  We asked the parties to brief the question whether the 2006 amendment to section 667.61, subdivision (j), eliminated defendants' eligibility for conduct credit.  (Stats. 2006, ch. 337, § 33, p. 2641.)  We hold as a matter of statutory interpretation that it did.  The parties agree.

Our review is governed by well established rules of statutory construction.  Our Supreme Court examined these rules in *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837-838:  "'Our fundamental task in construing' . . . any legislative enactment, 'is

to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)  We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.  On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)"  (Accord, *People v. Johnson* (2015) 61 Cal.4th 674, 682.)

As enacted in 1994, section 667.61, subdivision (j) provided: "Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 [Credit on Term of Imprisonment] shall apply to reduce the minimum term of 25 years in the state prison imposed pursuant to subdivision (a) or 15 years in the state prison imposed pursuant to subdivision (b).  However, *in no case shall the minimum term of 25 or 15 years be reduced by more than 15 percent for credits granted pursuant to Section 2933* [prison conduct credit], *4019* [presentence custody conduct credit], *or any other law providing for conduct credit reduction.*  In no case shall any person who is punished under this section be released on parole prior to serving at least 85 percent of the minimum term of 25 or 15 years in the state prison." (Stats. 1994 (1993-1994 1st Ex. Sess.) ch. 14, § 1, p. 8572, italics added.)  Section 667.61, subdivision (j) by its terms, specifically its express reference to

28

section 4019, limited to 15 percent the presentence conduct credit available to a defendant sentenced under section 667.61.

Section 667.61 was amended in 2006—prior to the present crimes—to eliminate the existing section 667.61, subdivision (j) and any reference to presentence conduct credits.  (Stats. 2006, ch. 337, § 33, p. 2641.)  It is uncertain on its face whether the amendment was intended to eliminate presentence conduct credit for defendants sentenced under section 667.61, or to authorize full conduct credit under section 4019.  We turn, therefore, to the legislative history.  Committee reports evidence the Legislature's intent to eliminate conduct credit for defendants sentenced under section 667.61, the so-called "One-Strike Law."  The Senate Committee on Public Safety's analysis of Senate Bill No. 1128 unambiguously states:  "Elimination of Sentencing Credits for One-Strike Inmates  [¶]  Existing law provides that a defendant sentenced to a term of imprisonment of either 15 years to life or 25 years to life under the provisions of the 'one-strike' sentencing scheme shall not have his or her sentence reduced by more than 15% by good-time/work-time credits.  (Penal Code 667.61, subd. (j).)  [¶]  This bill eliminates conduct/work credits for inmates sentenced under the one-strike law."  (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1128 (as amended March 7, 2006) p. N; accord, *id.* at p. W ["This bill eliminates sentencing credits that under existing law can reduce a defendant's minimum term by up to 15%"]; Sen. Rules Com., Off. of Senate Floor Analyses, 3d Reading Analysis of Sen. Bill No. 1128 (as amended May 26, 2006) pp. 8-9 [Sen. Bill No. 1128 eliminates eligibility "for credit to reduce the minimum term imposed"]; Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1128 (as amended May 30, 2006) p. 9 [same].)  In Couzens and

Bigelow, Sex Crimes: California Law and Procedure (The Rutter Group, 2015) section 13:15, page 13-78, the authors conclude: "Section[] . . . 667.61 (One Strike law) . . . [was] amended in 2006 to eliminate the provision that allowed such crimes to accrue 15 % conduct credits, whether before or after sentencing[.]  Now there are no conduct credits allowed against the minimum term." We hold, therefore, that defendants given indeterminate terms under section 667.61 are not entitled to any presentence conduct credit.  The present judgments must be modified and the abstracts of judgment amended to so reflect as to both defendants.

### 3.  Defendants' count 4 sentences for kidnapping to commit rape or oral copulation

#### a.  The issues arising from the count 2, 3 and 4 sentences

Section 667.61 subdivision (a) provides that an accused under specified circumstances can be subject to an indeterminate sentence of 25 years to life.[7]  (See *People v. Carbajal* (2013) 56 Cal.4th 521, 534; *People v. Anderson* (2009) 47 Cal.4th 92, 102.) Section 667.61, subdivision (c) identifies the offenses which can result in an indeterminate term if a specified qualifying circumstance is present.  Two of the offenses which can result in

---

[7]     Section 667.61, subdivision (a) states, "Except as provided in subdivision (j), (*l*), or (m), any person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life."

30

an indeterminate term when accompanied by a qualifying circumstance are present in this case: rape and oral copulation in concert. (§ 667.61, subds. (c)(3) and (7).) The qualifying circumstances are found in section 667.61, subdivisions (d) and (e). One of the qualifying circumstances which can result in an indeterminate 25-years-to-life sentence is specified in section 667.61, subdivision (d)(2) which states, "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." (See *People v. Byrd* (2011) 194 Cal.App.4th 88, 100-101; *People v. Jones* (1997) 58 Cal.App.4th 693, 712-716.) In our case, the jury convicted defendant of rape and forcible oral copulation in concert and found the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance allegation true. Both defendants were sentenced on count 4 to indeterminate life terms for kidnapping to commit rape and oral copulation in violation of section 209, subdivision (b). The count 4 indeterminate sentences carry specified minimum parole eligibility dates.

Ultimately, what we will decide is whether defendants may be punished under section 209, subdivision (b). As we shall explain in greater detail, section 209, subdivision (d) prohibits punishment under sections 667.61 and 209, subdivision (b) for the same act. Before we reach this conclusion though, we must resolve a preliminary jury instruction issue. The parties agree there is no issue concerning the adequacy of the charging documents.

31

### b. The jury instruction conference and instructions as to counts 2, 3 and 4

On May 12, 2014, after the conclusion of testimony, the trial court indicated that it would finalize the instructions on the next day. On May 13, 2014, after all of the testimony was completed the day before, the trial court discussed jury instructions with all counsel outside the jurors' presence. The trial court began its review of the instructions that would be given: "We are going to review the instructions. If you have any objection, comments, concerns, please state them. I am reading the [CALCRIM] number." The trial court expressly stated it would give the CALCRIM No. 3179 instruction which directs the jury to decide whether the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance was true. Neither counsel for defendants objected to the instruction. After the trial court recited all of the CALCRIM instructions it intended to read, the trial court addressed all three counsel. The trial court's inquiries and the three lawyers' responses are as follows: "[The Court:] I will read the instructions in the order in which I have indicated, and then we will continue with the reading [of] the instructions and/or the final arguments this afternoon. [¶] Anything else we need to take up at this time, Mr. DeBlanc? [¶] Mr. DeBlanc: Nothing else, your honor. [¶] The Court: Mr. Clark, anything further at this time? [¶] Mr. Clark: No. [¶] The Court: Ms. Hicks? [¶] Ms. Hicks: Your Honor, I am looking up that 12022(a)(1) because I just realized that one is not included in here, but if we need to, I will let the court know." As can be noted, neither defense attorney interjected an objection to the

CALCRIM No. 3179 instruction concerning the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance allegation.

The jury was instructed as to the elements of rape (count 2) and forcible oral copulation (count 3) in concert pursuant to CALCRIM Nos. 1000, 1001, 1015 and 1016. In addition, the jurors were instructed concerning the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance in compliance with CALCRIM No. 3179: "If you find the defendant guilty of the crimes charged in Counts 2 and/or 3, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant kidnapped Diane []. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To decide whether the defendant kidnapped Diane [] please refer to the separate instructions that I have given you on kidnapping. You must apply those instructions when you decide whether the People have proved this additional allegation. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

Two sets of CALCRIM instructions were given concerning two forms of kidnapping. The jury was instructed pursuant to CALCRIM No. 1203 concerning kidnapping to commit rape or another sex offense. This instruction related directly to the charge in count 4. In the margin, we have reproduced the instructions given concerning the asportation element of kidnapping to commit rape or another sex offense.[8] In addition,

---

[8] The jury was instructed as follows concerning the asportation element of the charged offense in count 4, kidnapping to commit rape or forcible oral copulation: "The defendant is

33

the jurors were instructed pursuant to CALCRIM No. 1215 as to the elements of simple kidnapping. The simple kidnapping instructions related to two issues. The jury was instructed that simple kidnapping was a lesser included offense of kidnapping to commit rape or oral copulation. Also, while explaining the kidnapping qualifying circumstance pursuant to CALCRIM No. 3179, the jurors were directed to the kidnapping instructions. The simple kidnapping instructions were clearly delineated and, as noted, referred to by the trial court when instructing concerning kidnapping qualifying circumstance pursuant to CALCRIM No. 3179.

---

charged in Count 4 with kidnapping for the purpose of rape or oral copulation in violation of Penal Code section 209(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit rape or oral copulation on Diane []; [¶] 2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] 4. The other person was moved or made to move the distance beyond that merely incidental to the commission of a rape or oral copulation; [¶] 5. When that movement began, the defendant already intended to commit rape or oral copulation; [¶] AND [¶] 6. The other person did not consent to the movement. [¶] AND [¶] 7. The defendant did not actually and reasonably believe that the other person consented to the movement. [¶] As used here, substantial distance means more than a slight or trivial distance. The movement must have increased the risk of physical or psychological harm to that person beyond that necessarily present in the rape or oral copulation. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement."

The instruction on the asportation element of a simple kidnapping was as follows:  "To prove Kidnapping, the People must prove that:  [¶]  1.  The defendant took, held, or detained another person by using force or by instilling reasonable fear;  [¶] 2.  Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;  [¶]  AND [¶]  3.  The other person did not consent to the movement;  [¶] AND  [¶]  4.  The defendant did not actually and reasonably believe that the other person consented to the movement.  [¶]  . . . [¶]  Substantial distance means more than a slight or trivial distance.  In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the distance the other person was moved was beyond that merely incidental to the commission of rape and or oral copulation, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."  (CALCRIM No. 1215.)  As to both the kidnapping to commit rape or oral copulation and the simple kidnapping issues, the jurors were fully instructed concerning the consent element of those two crimes.  (CALCRIM Nos. 1203, 1215.)  There is no issue concerning consent instructions in this case.

c.  The prosecutor's and defense attorneys' arguments

In her opening summation, the deputy district attorney argued to the jurors they should find the section 667.61,

35

subdivisions (a) and (d)(2) kidnapping qualifying circumstance allegation true. The prosecutor argued as to Mr. Moreland in connection with the special allegation appearing in the verdict form: "Kidnap. There's an allegation, kidnapped the victim of the present offense. Right? Was there a kidnap that happened in the commission of the rape sometime during that time while they had control of her? Here's the thing about the kidnap: The kidnap continues. [It's] not just the taking of her to the car. [It's] the driving around because that movement is putting her in a place of less safety. So [it's] the entire driving, even driving all the way to the cul-de-sac. That's all part of the kidnap. Did that happen in the commission of the rape? True. So you write in true." The prosecutor briefly referred to the kidnapping qualifying circumstance allegation when discussing the charges against Mr. Adams. No objection of any kind was interposed by either defense attorney to the prosecutor's argument concerning the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance.

In their arguments, defense counsel never discussed CALCRIM No. 3179 nor the elements of the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance allegation. Their arguments focused on: jury instructions concerning reasonable doubt and the conduct of jurors; the lack of believability of the prosecution witnesses including the fact that Diane was a prostitute; the problems with identification testimony; and gang and ballistics testimony. Neither of the two defense attorneys argued their clients were guilty only of any lesser included offenses. Mr. Adams's counsel requested a not guilty verdict be returned.

### d. The counts 2, 3 and 4 verdicts and findings

On May 16, 2014, the jury returned its verdicts. As to count 2, Mr. Adams was convicted of forcible rape while acting in concert and the following special allegations were found to be true: he personally used a firearm within the meaning of sections 667.61, subdivisions (a) and (e) and 12022.53, subdivisions (b) and (e); he kidnapped the victim within the meaning of section 667.61, subdivisions (a) and (d); and the sexual assault was committed for the benefit of a street gang within the meaning of section 186.22, subdivision (b)(1)(C). As to count 3, Mr. Adams was convicted of oral copulation by acting in concert and the jury found two special allegations to be true. The jury found Mr. Adams kidnapped the victim within the meaning of section 667.61, subdivisions (a) and (d). In addition, the jury found the offense was committed for the benefit of a street gang within the meaning of section 186.22, subdivision (b)(1)(C). However, the jury found the firearm use allegation within the meaning of section 667.61, subdivisions (a) and (e) was not true. As to count 4, the jury convicted Mr. Adams of kidnapping to commit another crime in violation of section 209, subdivision (b)(1). The jury found the gang and firearm use allegations to be true. (§§ 186.22, subd. (b)(1)(C); 12022.53, subds. (b) & (e).)

As to Mr. Moreland, the jury returned the same guilty verdicts on counts 2 (rape in concert), 3 (forcible oral copulation in concert) and kidnapping to commit another crime. However, as to Mr. Moreland, more extensive special allegations findings were returned. As to count 2, the forcible rape in concert charge, the jury found the following special allegations to be true: Mr. Moreland personally used a firearm within the meaning of

37

sections 667.61, subdivisions (a) and (e) and 12022.53, subdivision (b); Mr. Moreland kidnapped the victim within the meaning of section 667.61 subdivisions (a) and (d); the sexual assault was committed for the benefit of a street gang within the meaning of section 186.22, subdivision (b)(1)(C); and Mr. Moreland inflicted great bodily injury upon the victim within the meaning of sections 667.61, subdivisions (a) and (d) and 12022.8, subdivision (a).  As to count 3, the forcible oral copulation charge, the jury found the two great bodily injury allegations to be not true.  (§§ 667.61, subds. (a) & (d), 12022.8.)  But the jurors found as to count 3 the following special allegations were true as to Mr. Moreland:  he personally used a firearm within the meaning of sections 667.61, subdivisions (a) and (e) and 12022.3, subdivision (a); he kidnapped the victim within the meaning of section 667.61, subdivisions (a) and (d); and the crime was committed for the benefit of a street gang.  (§ 186.22, subd. (b)(1)(C).)  As to count 4, the section 209, subdivision (b)(1) kidnapping to commit another crime charge, the jury found the following special allegations to be true:  the crime was committed for the benefit of a street gang within the meaning of section 186.22, subdivision (b)(1)(C); Mr. Moreland personally used a firearm within the meaning of section 12022.53, subdivision (b); and he inflicted great bodily injury on the victim within the meaning of section 12022.7, subdivision (a).

e.  The counts 2, 3 and 4 sentences

As to Mr. Adams, for count 2, forcible rape in concert, he received an indeterminate sentence of 25 years to life.  In addition, as to count 2, Mr. Adams received 10 years for firearm

38

use which was stayed pursuant to section 12022.53, subdivision (e)(2).  As a result of the gang allegation, an additional 10 years was imposed pursuant to section 186.22, subdivision (d)(1)(C).  The total count 2 sentence was 35 years to life.  As to count 3, forcible oral copulation in concert, Mr. Adams was sentenced to state prison for a term of 25 years to life plus 10 years for the gang enhancement.  The count 3 section 12022.3, subdivision (a) firearm use finding was stayed pursuant to section 12022.53, subdivision (e)(2).  The two sexual assault sex counts were ordered to run consecutively pursuant to section 667.6, subdivision (d).  Even if mandatory consecutive sentencing was inappropriate, the trial court indicated it would exercise its discretion pursuant to section 667.6, subdivision (c) and impose consecutive sentences.  As to count 4, the kidnapping to commit rape or oral copulation conviction, Mr. Adams received a life term.  Pursuant to section 186.22, subdivision (b)(5), Mr. Adams received a minimum term of 15 years.  The 10-year firearm use finding was stayed pursuant to section 12022.53, subdivision (e)(2).  The trial court made no oral statement as to whether it was imposing consecutive or concurrent terms on the sex offenses charges, counts 2 and 3, and the kidnapping conviction, count 4.  The abstract of judgment states the count 4 kidnapping to commit rape or oral copulation sentence was to run consecutively with the sex offenses.

As to Mr. Moreland, similar sentences were imposed as to counts 2, 3 and 4. However, Mr. Moreland had been subject to a prior serious felony juvenile dispositional order and was a minor when the present crimes were committed.  Thus, Mr. Moreland's sentence differs in several respects from that imposed on Mr. Adams.  Mr. Adams was not a juvenile at the time of the

39

commission of the offenses specified in the second amended information.  As to count 2, Mr. Moreland received a sentence of 50 years to life (25 years to life doubled because of his prior serious felony juvenile disposition) plus an additional:  10-year term pursuant to section 12022.53, subdivision (b); 5 years for great bodily injury pursuant to section 12022.8, subdivision (a); plus 10 years as a result of the section 186.22, subdivision (b)(1)(C) gang enhancement finding.  As to count 3, Mr. Moreland received a 50-years-to-life sentence plus 10 years for firearm use and the gang enhancement.  The sentences as to counts 2 and 3 were ordered to run consecutively pursuant to section 667.6 subdivisions (c) and (d).  As to count 4, the kidnapping to commit rape or oral copulation conviction, defendant received a life sentence.  The oral pronouncement of judgment makes no reference to counts 2 and 3, the sexual assault charges, running consecutively to the aggravated kidnapping sentence.  The abstract of judgment states that counts 3, oral copulation in concert, and 4, kidnapping to commit rape and oral copulation, were ordered to run consecutively.  Pursuant to section 186.22, subdivision (b)(5), Mr. Moreland received a 15 year minimum parole eligibility term.  As noted, Mr. Moreland was a juvenile when he engaged in the crimes alleged in the second amended information.  Pursuant to *People v. Caballero, supra,* 55 Cal.4th at pages 268-269, the trial court imposed a minimum parole eligibility date of 35 years from the date of sentencing.  (See *Graham v. Florida, supra,* 560 U.S. at p. 82.)

40

f. The instructional error concerning kidnapping as defined by section 667.61, subdivision (d)(2) was harmless beyond a reasonable doubt

As noted, section 667.61, subdivision (d)(2) permits the imposition of an indeterminate 25-years-to-life sentence under these circumstances: "(d) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] . . . [¶] (2) The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." The section 667.61, subdivision (d)(2) qualifying circumstance has two elements. The first element requires the victim be kidnapped. The second element requires that victim's movement *substantially increase the risk of harm* to him or her above that level of danger necessarily inherent in the sex offense. (*People v. Jones, supra,* 58 Cal.App.4th at p. 713.) Section 667.61, subdivision (d)(2) contains an element (substantial increase in the risk of harm) beyond that in simple and aggravated kidnapping. Aggravated kidnapping has as an element an increase in the risk of the harm over that present in the enumerated offenses. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 979-980; *People v. James* (2007) 148 Cal.App.4th 446, 454, fn. 5.) Prior to 1998, section 209 aggravated kidnapping had as an element a substantial increase in the risk of harm to the victim beyond that present in the enumerated offense. But in 1997, section 209, subdivision (b)(2) was amended to remove the "substantially" increase the risk of harm element from the statutory definition of aggravated

41

kidnapping. (Stats. 1997, ch. 817, § 2, pp. 5519-5520; *People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20; *People v. Martinez* (1999) 20 Cal.4th 225, 232 & fn. 2.)

The relevant sex offenses specified in section 667.61, subdivision (c) are in concert rape or forcible oral copulation. And as previously noted, the jurors were instructed pursuant to CALCRIM No. 3179 that they must decide the additional allegation of whether defendant kidnapped Diane. As part of the CALCRIM No. 3179 qualifying circumstance instruction, the jurors were instructed as follows: "To decide whether the defendant kidnapped Diane [], please refer to the separate instructions that I have given you on kidnapping. You must apply those instructions when you decide whether the People have proved this additional allegation."

The jurors were instructed concerning kidnapping pursuant to CALCRIM No. 1215. We have previously set forth the entirety of the CALCRIM No. 1215 instruction concerning kidnapping. (See part IV(C)(3)(b), *supra*.) The instruction defines asportation. There is no issue concerning the asportation element raised by CALCRIM No. 1215. But, as previously noted, CALCRIM No. 1215 also includes a discussion concerning risk of harm in the context of whether the movement was substantial. One of the factors in evaluating whether an asportation has been for a substantial distance is the increase in the risk of harm from the movement. (*People v. Martinez, supra,* 20 Cal.4th at p. 237 ["the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation"]; see *People v. Johnson, supra,* 61 Cal.4th at p. 771 [same].)

42

For clarity's purposes we reiterate the risk of harm instructions here: "In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the distance the other person was moved was beyond that merely incidental to the commission of rape and or oral copulation, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, *or* decreased the likelihood of detection." (Italics added.) The CALCRIM No. 1215 simple kidnapping risk of harm instruction, as given here, does not require the jury to find an increased risk of harm resulting from the asportation. By contrast, section 667.61, subdivision (d)(2) requires that the movement increased the risk of harm beyond that present in the two sex offenses charged in counts 2 and 3.

Defendant argues the jurors were not properly instructed concerning the section 667.61, subdivision (d)(2) increased risk of harm element. We agree. There is a sua sponte duty to instruct concerning the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance. (*People v. Jones, supra,* 58 Cal.App.4th at p. 709; see *People v. Mancebo* (2002) 27 Cal.4th 735, 748.) Here, the jurors were referred to a definition of kidnapping for purposes of section 667.61, subdivision (d)(2) to CALCRIM No. 1215. CALCRIM No. 1215 does not adequately instruct the jurors concerning the substantial increase in the risk of harm element of a section 667.61, subdivision (d)(2) kidnapping qualifying circumstance. CALCRIM No. 1215 does not *require* the jury to find the asportation substantially increased the risk of

43

harm over that level of risk necessarily inherent in the sex offenses.  And the reference to the increase of risk in CALCRIM No. 1215 appears in a disjunctive discussion of how to evaluate the substantial distance element of kidnapping.  However, we conclude the failure to properly instruct on the increased risk of harm element of the section 667.61, subdivision (d)(2) kidnapping qualifying circumstance was harmless beyond a reasonable doubt.  (*People v. Luna* (2012) 209 Cal.App.4th 460, 468 [§ 667.61, subd. (e)(1) kidnapping qualifying circumstance]; *People v. Jones, supra,* 58 Cal.App.4th at pp. 715-716 [§667.61, subd. (d)(2) aggravated kidnapping].)

No doubt, the jurors impliedly found that the movement of Diane increased the risk of harm to her.  As noted, the jurors were instructed on the charge of kidnapping for the purpose of rape or oral copulation pursuant to CALCRIM No. 1203.  The jurors were instructed, "The movement must have increased the risk of physical or psychological harm to that person beyond that necessarily present in the rape or oral copulation."  As instructed, in order to convict defendant of aggravated kidnapping within the meaning of section 209, subdivision (b)(1), the jurors were required to find the movement increased the risk of harm to Diane.  As we have noted, after January 1, 1998, an increase in the risk of harm was an essential element of section 209 subdivision (b)(1) aggravated kidnapping.  Thus, the jury impliedly found that there was an increase in the risk of harm because of the lengthy asportation that occurred in our case. (*People v. Mincey* (1992)  2 Cal.4th 408, 438 ["[A] trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual question adversely to the defendant under other instructions."]; *People v.*

44

*Stankewitz* (1990) 51 Cal.3d 72, 99 ["By finding the firearm-use allegation to be true, the jury impliedly found that defendant was a direct participant, or, at a minimum, that he aided the robbery with the requisite intent."].) Thus, the sole prejudicial error issue that remains relates to the "substantial" increase in the risk of harm element in section 667.61, subdivision (d)(2). While deciding the aggravated kidnapping charge in count 4, the jurors impliedly found that there had been an increase in risk of harm during the lengthy asportation.

In addition to the jury's implied findings, the error was harmless because the substantial risk of harm issue was uncontested. The omission of an element during jury instruction may be harmless when the factual issue is uncontested by the defense. (*People v. Mil* (2012) 53 Cal.4th 400, 410 ["the omission of an element of a . . . sentencing factor is harmless when 'the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.'"]; *People v. Garcia* (2001) 25 Cal.4th 744, 761 [same].) The substantial increase in risk element of section 667.61, subdivision (d)(2) was uncontested by Mr. Adams. Mr. Adams called no witnesses and chose to rely on the state of the evidence. Mr. Adams's lawyer never argued that the asportation did not substantially increased the risk of harm and never mentioned the 667.61, subdivision (d)(2) qualifying circumstance instructions nor special finding. Mr. Moreland denied being present throughout the sexual assaults, kidnapping, attempted murder and other crimes committed against Diane. However, during jury argument, Mr. Moreland's counsel never discussed the substantially increased risk of harm element nor anything concerning the 667.61, subdivision (d)(2) qualifying

circumstance issue.  The substantial increase in the risk of harm entire issue was uncontested and, with good reason, because the lengthy asportation allowed defendants to leave the presence of Mr. Odhiamo.  He testified that as soon as the robbery was completed and Diane was removed forcibly from his car, defendants fled with her.  During the movement, the jurors found that both defendants personally used a firearm.  Further, it was during the lengthy asportation Diane was repeatedly sexually assaulted.

The calculus of whether the evidence was overwhelming is closer as to Mr. Moreland.  He denied any participation in the sexual assaults and other violent crimes.  However, we have reviewed the entirety of the testimony and evidence.  The evidence was overwhelming in terms of the issue before us—whether the victim's movement *substantially* increased the risk of harm to her.  The failure to instruct the jury as to the substantial increase in the risk of harm element of section 667.61, subdivision (d)(2) was harmless beyond a reasonable doubt.  (*Neder v. United States* (1999) 527 U.S. 1, 17; *People v. Mil, supra,* 53 Cal.4th at pp. 410-411.)  Hence, we conclude that no instructional errors permit reversal and we must thus resolve the section 209, subdivision (d) question.

g.  Section 209, subdivision (d)

Section 209, subdivision (d) states:  "Subdivision (b) shall not be construed to supersede or affect Section 667.61.  A person may be charged with a violation of subdivision (b) and Section 667.61.  However, *a person may not be punished under subdivision (b) and Section 667.61 for the same act that*

46

*constitutes a violation of both subdivision (b) and Section 667.61.*"
(Italics added.) The "the same act that constitutes a violation of
both subdivision (b) and Section 667.61" language utilized by the
Legislature in section 209, subdivision (d) is somewhat unclear.
Section 209, subdivision (d) was adopted as part of Assembly Bill
No. 59 (1997-1998 Reg. Sess.) (Assembly Bill No. 59, hereafter).
(Stats. 1997, ch. 817, § 2, pp. 5519-5520.) None of the legislative
committee reports prepared for Assembly Bill No. 59 discuss
section 209, subdivision (d). (Assem. Com. on Appropriations,
Rep. on Assem. Bill No. 59 as amended Mar. 10, 1997; Assem.
Com. on Public Safety, Rep. on Assem. Bill No. 59 as amended
Mar. 10, 1997; Assem. Third Reading Rep. on Assem. Bill No. 59
as amended June 3, 1997; Sen. Com. on Public Safety, Rep. on
Assem. Bill No. 59 as amended June 3, 1997; Sen. Appropriations
Committee, Fiscal Summary of Assem. Bill No. 59, as amended
Aug. 25, 1997; Sen. Rules Com., Office of Sen. Floor Analyses,
Third Reading Analysis of Assem. Bill No. 59 as amended Sept. 4,
1997.)

Pursuant to section 209, subdivision (d), defendants could
not be punished for the *same act* that violated both sections 209,
subdivision (b) *and* 667.61. The act prohibited by section 209,
subdivision (b), as applicable here, is kidnapping to commit rape
or oral copulation. The section 667.61 conduct is the section
667.61, subdivisions (c)(3) and (7) rape or oral copulation in
concert violations under the section 667.61, subdivision (d)(2)
qualifying circumstances. Section 667.61, subdivision (d)(2)
requires a kidnapping occur. The violations of section 209,
subdivision (b) and 667.61 subdivisions (c)(3) and (7) under the
section 667.61, subdivision (d)(2) qualifying circumstances have
two common elements. In our context, the section 209

47

subdivision (b) violation requires the commission of a kidnapping with the intent to commit one of the enumerated sex offenses. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151, fn. 6; *People v. Bell* (2009) 179 Cal.App.4th 428, 435, fn. 2.)  The 667.61 subdivisions (c)(3) and (7) violations under the section 667.61, subdivision (d)(2) qualifying circumstances involve both the kidnapping and commission of a section 209, subdivision (b) enumerated sex offense.

There are two elements in section 209, subdivision (b) which differ from those in section 667.61, subdivision (d)(2).  The first different element is the intent with which the aggravated kidnapping was committed.  As we explained, aggravated kidnapping to commit a specified sex offense in violation of section 209, subdivision (b) requires an intent to commit one of the enumerated crimes.  (*People v. Dominguez, supra,* 39 Cal.4th at p. 1151, fn. 6; *People v. Bell, supra,* 179 Cal.App.4th at p. 435, fn. 2.)  The second different element between sections 209, subdivision (b) and 667.61, subdivision (d)(2) involves the risk of harm.  As we have noted, in order to violate section 209, subdivision (b), there is no requirement the risk of harm be substantially greater than that for the enumerated sex offense. (*People v. Vines, supra,* 51 Cal.4th at p. 869, fn. 20; *People v. Martinez, supra,* 20 Cal.4th at p. 232 & fn. 4.)  By contrast, section 667.61, subdivision (d)(2) requires there be a substantial increase in the risk of harm.  But the Legislature used the term "same act" that violates both sections.  The same act language evinces a legislative intent to avoid punishment of an act, not an offense with the precise same elements.  And section 209, subdivision (d) refers to the entirety of section 667.61 not to any particular qualifying circumstances.  Thus, the differences in

48

statutory elements we have discussed between sections 209, subdivision (b) and section 667.61, subdivision (d)(2) are irrelevant in our case.

At issue is existence of a common act occurring against a single victim on the same day which violates section 209, subdivision (b) and section 667.61. All the parties, including the Attorney General, agree that section 209, subdivision (d) refers to an *act*. And here, the parties agree for purposes of section 209, subdivision (d), that the relevant act is the kidnapping of Diane with the intent to commit either charged sex offense. It is this act that constitutes a violation of both section 209, subdivision (b) and section 667.61. Therefore, pursuant to section 209, subdivision (d), the trial court was required to stay the punishment on count 4, kidnapping to commit rape or oral copulation, as to each defendant. (See *People v. Garza* (2003) 107 Cal.App.4th 1081, 1084.) For that act, the aggravated kidnapping sentence must be stayed. The judgments must be modified and the abstracts of judgment amended to so provide.

[Part IV (C)(4)-(7) is deleted from publication.]

4. Mr. Moreland's count 4 and 6 sentences

The trial court orally imposed as to counts 4 and 6 a section 186.22, subdivision (b)(5) 15-year minimum parole eligibility term. However, Mr. Moreland had previously been convicted of a serious felony. Therefore, the 15-year minimum parole eligibility term in each count should have been doubled. (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1); *People v. Jefferson* (1999) 21 Cal.4th 86, 90; see *People v. Acosta* (2002) 29 Cal.4th 105, 113-114.) This

is subject, of course, to the trial court's order setting an indeterminate term of 35 years to life under *People v. Caballero, supra,* 55 Cal.4th at pages 268-269. The judgment must be modified and the abstract of judgment amended to so provide.

### 5. The sex offenses fines

The trial court imposed a $300 sex offenses fine (§ 290.3) on each defendant on each of counts 2 (§ 264.1, subd. (a)) and 3 (§ 288a, subd. (d)(1)). We asked the parties to brief several issues in relation to this fine. First, defendants were subject to the fine on count 4 (§ 209, subd. (b)(1)) in additional to counts 2 and 3. This is a question of statutory interpretation. Here, the Legislature's intent is clear from the statutory language. (See, e.g., *In re D.B.* (2014) 58 Cal.4th 941, 946-947 [Welf. & Inst. Code, § 733, subd. (c)]; *People v. Licas* (2007) 41 Cal.4th 362, 367-371 [§ 12034, subd. (c)].) Section 290.3, subdivision (a) provides in part, "Every person who is convicted of *any offense specified in subdivision (c) of Section 290* shall . . . be punished by a fine . . . ." (Italics added.) The offenses specified in section 290, subdivision (c) include, "Section . . . 209 [kidnapping] committed with intent to violate Section . . . 288a [oral copulation]." Defendants were convicted in count 4 of kidnapping to commit rape or oral copulation in violation of section 209, subdivision (b)(1). Defendants were convicted in count 3 of acting in concert to commit forcible oral copulation in violation of section 288a, subdivision (d)(1. Therefore, defendants violated section 209 with intent to violate section 288a, an offense subject to the section 290.3 fine. The trial court's unexplained failure to impose the fines on count 4 is not, however, jurisdictional error. (*People*

*v. Walz* (2008) 160 Cal.App.4th 1364, 1371; *People v. Burnett* (2004) 116 Cal.App.4th 257, 261-262.)  The prosecutor did not object to the trial court's failure to impose the fines on count 4.  On this silent record, we presume the trial court determined defendants did not have the ability to pay the additional fine.  (*Ibid*; see *People v. Smith* (2001) 24 Cal.4th 849, 852.)

Second, effective September 20, 2006, section 290.3, subdivision (a) provides for sex offenses fines in the amount of $300 "upon the first conviction" and $500 "upon the second and each subsequent conviction."  (Stats. 2006, Ch. 337, § 18, p. 2610.)  Because defendants were each convicted of more than one count subject to the sex offenses fine, they each had a second and subsequent conviction within the meaning of the statute.  (*People v. O'Neal* (2004) 122 Cal.App.4th 817, 822; see *People v. Walz, supra,*160 Cal.App.4th at p. 1371.)  Therefore, each defendant was subject to a $300 fine on count 2, and a $500 fine on count 3.  (*Ibid.*)

Third, the trial court failed to impose mandatory penalties and surcharges on the fines.  This is an error that can be raised for the first time on appeal.  (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157; *People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530.)  As of the date of the present offenses, May 2, 2011, each sex offenses fine was subject to:  a 100 percent state penalty (§ 1464, subd. (a)(1)); a 70 percent county penalty (Gov. Code, § 76000, subd. (a)(1)); a 20 percent state surcharge (§ 1465.7, subd. (a)); a 30 percent state court construction penalty (Gov. Code, § 70372, subd. (a)(1)); a 10 percent deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1)); a 30 percent state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a)); and a 20 percent emergency medical services penalty (Gov. Code,

51

§ 76000.5, subd. (a)(1)).  (See *People v. Johnson* (2015) 234
Cal.App.4th 1432, 1457-1458; *People v. Hamed* (2013) 221
Cal.App.4th 928, 940-941.)

Fourth, the matter must be remanded for an ability to pay
determination.  Section 290.3, subdivision (a) mandates
imposition of the fine "unless the court determines that the
defendant does not have the ability" to pay it.  Here, the trial
court impliedly concluded defendants each had the ability to pay
a $600 fine.  However, if imposed as discussed above, the fines,
penalties and surcharges will greatly exceed $600.  Therefore,
upon remittitur issuance, the trial court must consider
defendants' ability to pay the fines, penalties and surcharges.
(*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249-1250;
*People v. Walz, supra,* 160 Cal.App.4th at pp. 1370-1371.)  The
trial court must conduct a hearing concerning each defendant's
ability to pay the sex offenses fines in light of the total financial
obligation, which includes the foregoing penalties and
surcharges.  (*People v. Johnson, supra,* 234 Cal.App.4th at pp.
1458-1459; *People v. Corrales* (2013) 213 Cal.App.4th 696, 702.)
If additional fines are imposed, the trial court is to personally
insure the superior court clerk prepares amended abstracts of
judgment detailing the base fines, penalties and surcharge.
(*People v. Johnson, supra,* 234 Cal.App.4th at p. 1459; *People v.*
*Hamed, supra,* 221 Cal.App.4th at p. 940; *People v. Valenzuela,*
*supra,*172 Cal.App.4th at p. 1250.)

### 6. Mr. Adams's Abstract of Judgment

The trial court orally stated it was staying a section 12022.3 firearm use enhancement finding as to Mr. Adams in count 3. In addition, Mr. Adams's abstract of judgment references a purported firearm use finding under section 12022.53, subdivision (b). However, the jury did not return any firearm use finding as to count 3 under either section 12022.3 or section 12022.53, subdivision (b). Therefore, the reference to a section 12022.53, subdivision (b) finding in Mr. Adams's abstract of judgment must be stricken. (*People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

### 7. Mr. Moreland's Abstract of Judgment And the Attorney General's Argument

Mr Moreland's abstract of judgment states that count 6, attempted willful, deliberate and premeditated murder, is to run consecutive to count 2, rape in concert. However, the oral pronouncement of judgment does not reflect such an order. Thus, absent some other reason that requires consecutive sentencing, the abstract of judgment must be corrected to state that counts 2 and 6 are to run concurrently. (§ 669, subd. (b) [in the absence of a contrary ruling, sentences are to run concurrently]; *People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14, 1226 [the abstract of judgment must comport to the oral pronouncement]; *In re Calhoun* (1976) 17 Cal.3d 75, 79-80 [sentences are presumed to run concurrently].)

The Attorney General argues though that consecutive sentences were mandatory pursuant to sections 667, subdivision

(c)(6) and 1170.12, subdivision (a)(6).  However, the trial court never orally imposed consecutive sentences on the attempted murder and sexual assault counts.  There is substantial evidence the attempted murder involved the same firearm used to commit the sex crimes and arose out of the same set of operative facts. (*People v. Lawrence* (2000) 24 Cal.4th 219, 233; *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1566-1567.)  Had the trial court orally ordered consecutive sentencing on counts 2 and 6, we would have upheld the order under sections 667, subdivision (c)(6) and 1170.12, subdivision (a)(6).  Such an order would have been supported by substantial evidence.  But the "common act or criminal conduct" determination is fact-driven and is reviewed for substantial evidence.  (See *People v. Osband* (1996) 13 Cal.4th 622, 730 [where consecutive sentences were imposed for rape and robbery, substantial evidence supported the trial court's implied finding that the accused entertained more than one objective]; *People v. Garcia, supra,* 167 Cal.App.4th at pp. 1566-1567 [no substantial evidence supported mandatory consecutive sentencing]; *People v. Chan* (2005) 128 Cal.App.4th 408, 424 [no substantial evidence supported the trial court's order imposing concurrent sentences where the sex offenses were committed on separate occasions].)  In the face of the trial court's silence and the presence of substantial evidence that common acts or conduct are present, we respectfully disagree with the Attorney General.

[Part V is deleted from publication.]
## V.  DISPOSITION

The judgment as to Mr. Moreland is modified to impose minimum parole eligibility terms of 30 years on counts 4 and 6. The judgments are further modified to award Mr. Adams 563 days of presentence custody credit and to award Mr. Moreland 611 days of such credit.  The reference to a Penal Code section 12022.53, subdivision (b) finding in Mr. Adams's abstract of judgment must be stricken.  Mr. Moreland's abstract of judgment is modified to delete the reference to count 2 running consecutively to count 6.  The judgments are modified as to both defendants to stay the punishment on count 4 and to delete the conduct credit awards.

Mr. Moreland's sentence is vacated and the matter is remanded to the trial court for resentencing in light of *Contreras*, *supra*, 4 Cal.5th 349.  The court is directed to consider any mitigating circumstances of Mr. Moreland's crimes and life and the impact of any new legislation and regulations on appropriate sentencing.  The court is further directed to impose a time by which Mr. Moreland may seek parole consistent with *Contreras*.

On remand, the trial court will also hold a hearing to determine each defendant's ability to pay the sex offense fines together with applicable penalties and surcharges.  The judgments are affirmed in all other respects.

Upon resentencing and resolution of the ability to pay issue, the trial court is to personally insure that the superior court clerk prepares fully correct amended abstracts of judgment as discussed in the opinion's body.  The clerk of the superior court

is to forward copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

**CERTIFIED FOR PARTIAL PUBLICATION**


                    JASKOL, J. *
We concur:



                    BAKER, J., Acting P.J.



                    MOOR, J.

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.